IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

Oscar Contreras Aguilar,  )
    Plaintiff,  )
      )
v.  )      1:19cv118 (AJT/JFA)
      )
Lieutenant Eleazar Luna, et al.,  )
    Defendants.  )

MEMORANDUM OPINION

Oscar Contreras Aguilar, a federal inmate proceeding pro se, has filed a civil-rights action alleging that three correctional officers violated his constitutional rights while he was temporarily confined as a pretrial detainee at Northern Neck Regional Jail (NNRJ), a Virginia state-run correctional facility. [Dkt. No. 1]. See 42 U.S.C. § 1983. Aguilar claims that (1) Lieutenant Eleazar Luna and Sergeant Tyler Taylor applied excessive force; (2) Sergeant Taylor and Lieutenant Jason Newsome subjected him to unreasonable strip searches; (3) Lieutenant Luna failed to protect him; and (4) the three officers subjected him to unconstitutional conditions of confinement. The defendants have filed a motion for judgment on the pleadings and a second motion summary judgment on each of Aguilar's claims [Dkt. No. 60], and have provided the notice required by Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) [Dkt. No. 62]. Plaintiff opposes that motion and has himself moved for summary judgment on the strip-search claim. [Dkt. Nos. 48, 65]. Because Aguilar has failed to state a claim for relief on his failure-to-protect claim, the Court will grant defendants' motion for judgment on the pleadings on that ground. The summary judgment motion as to the remaining claims will be granted in part and denied in part because the undisputed facts demonstrate that

Aguilar was not subjected to unconstitutional conditions of confinement, but disputed material facts preclude summary judgment on Aguilar's claims for unreasonable searches and excessive force.

## I. Background

During the period relevant to the complaint, Aguilar was detained at NNRJ. [Pl. Compl. ¶ 3]. On September 18, 2018, Aguilar was placed in Cell 214 in N Pod, where he was housed with another inmate until he was transferred to Cell N-165, a segregation cell, on September 24, 2018. [Id. ¶ 8; Def. Mot. Summ. J., Hull Aff. ¶ 8 & Luna Aff. ¶¶ 3, 6]. What precipitated Aguilar's placement in Cell N-165, the actions the defendants took during and after the transfer, and the conditions of the new cell—namely, the actions forming the basis of the complaint—the parties dispute.

Plaintiff's version of events, principally laid out in his verified complaint, is as follows. After plaintiff visited with his attorney on September 24, 2018, defendants Lieutenant Luna and Sergeant Taylor escorted him back to N Pod, but not to Cell 214; instead, the officers brought him to Cell N-165. [Pl. Compl. ¶¶ 15, 18]. Next, Aguilar declares, while still having his hands cuffed behind him and feet shackled, he was assaulted by the two officers. [Id. ¶¶ 19–26]. Specifically, Aguilar avers that he "was slammed hard against the wall hitting the left side of his face"; Taylor "pulled the shackles on plaintiff's feet hard, making plaintiff fall face first on the concrete floor"; Luna repeatedly punched him in the back of the head while Taylor "was bending and twisting plaintiff's left foot and big toe"; Taylor applied "brutal force" to Aguilar's back with his knee, and bent and twisted Aguilar's hands and wrists; and, after plaintiff yelled out in pain, Luna forcefully put his knee against the right side of Aguilar's face. [Id. ¶¶ 19–21].

2

Next, Aguilar says, Lieutenant Luna instructed another officer to use a pocketknife to cut his jumpsuit. [Id. ¶ 22]. Then, Luna pushed Aguilar up against a wall while another guard pulled down Aguilar's boxers, spread his buttocks, and "slid his hand in plaintiff's ass crack." [Id.]. At that point, plaintiff voiced concern, and the guards informed him that they were looking for a shank. [Id. ¶ 23]. Then, Aguilar avers, the officers dragged him toward the cell door and exited the cell, but not before pulling the chain attached to his handcuffs through the cell door's food slot, "smashing him hard against the door." [Id. ¶¶ 25–26]. Afterwards, a nurse came by and, according to Aguilar, "looked at plaintiff for about 2 seconds and told the guards, 'he'll be fine,'" even though the beating had caused swelling to the left side of his face; a bloody, split lip; contusions to his face and body; and a swollen, sprained left toe. [Id. ¶¶ 19–20, 27].

Aguilar contends that he was left in that cell for the next eleven days with nothing but his boxers—no other clothes, no drinking water, no mattress. [Id. ¶ 28]. He further contends that he was provided smaller-than-normal amounts of food during that period. [Id.].

During his time in Cell N-165, Aguilar asserts he was strip searched four times, even though he "was under constant supervision, didn't have anything in his cell, was locked in 24/7, and was not even allowed to have rec or shower," thus rendering him unable to obtain contraband. [Id. ¶ 29]. Aguilar asserts that Sergeant Taylor performed three of those searches, during which he made Aguilar squat and cough in front of five or six other guards, for "the purpose of harassing, humiliating, and punishing plaintiff." [Id. ¶ 30]. Aguilar alleges that Lieutenant Newsome performed a fourth search, and the officer similarly forced him to squat and cough in front of other officers but also grabbed his buttocks and spread them while saying, sarcastically, "I gotta make sure you don't have a shank in your ass." [Id. ¶ 31].

3

In their summary judgment submissions, defendants relay a completely different series of events. Ted Hull, the Superintendent of NNRJ, avers by affidavit that on September 24, 2018, he received a telephone call from the U.S. Marshal's Office, informing him about a potential escape by two MS13 Gang members, including Aguilar. [Dkt. No. 60, Def. Mot. for Summ. J., Hull Aff. ¶¶ 1, 6]. Hull then relayed that information to Lieutenant Luna and another officer, Sergeant English, and instructed them to search the two inmates' cells. [Id. ¶ 7]. In his affidavit, Luna avers during the search, they discovered a 3" x 4" hole in the interior cell wall connecting N Pod to O Pod; a crack in the cell window leading to the exterior; that the cell vent was loose from the wall; and two shanks. [Id., Luna Aff ¶ 5]. The two officers retrieved Aguilar from a meeting with his attorney (where he was located during the search), brought him back to N Pod, and advised him that he would be moved to cell N-165 and strip searched. [Id. ¶ 6]. For his part, Aguilar disputes that he possessed shanks, was planning an escape, and damaged his cell in furtherance of escaping. [Dkt. No. 65, Pl. Aff.].

According to Lieutenant Luna, Aguilar "adamantly refused to be strip searched," even after the officer gave "multiple orders to get on his knees so that the restraints could be removed and plaintiff could be searched." [Dkt. No. 60, Def. Mot. for Summ. J., Luna Aff. ¶ 7]. Luna further avers that Aguilar "became combative, actively resisting our attempts to remove his restraints, and kicking the officers." [Id.]. At that point, Luna says, he called for backup. [Id.]. One officer who arrived on the scene was Sergeant Taylor, who attests by affidavit that, while the officers attempted to remove Aguilar's leg shackles, Aguilar kicked him in the chest. [Id., Taylor Aff. ¶ 4]. Luna and Taylor declare that they "only employed the force necessary to gain plaintiff's compliance." [Id. ¶ 5 & Luna Aff. ¶ 9]. Neither officer elaborated on the amount and

type of force they applied in their respective force reports, noting only that verbal and physical force was used. [Id., Ex. 8 & Ex. 10].

Once the officers gained plaintiff's compliance, Luna attests, they disrobed Aguilar and conducted a "visual body cavity search," which included an inspection of Aguilar's head, hair, mouth, torso, pelvic area, legs, feet, and buttocks. [Id., Luna Aff. ¶ 8 & Ex. 8]. The jail's search policy, which Luna declares he followed, does not permit officers to "touch or conduct any physical intrusion into the individual's rectal or vaginal cavities" during a visual search. [Id., Luna Aff. ¶ 8 & Ex. 5]. The policy permits body-cavity searches to be performed by medical staff only. [Id., Ex. 5].

After the search was completed, an EMT, Officer J. Barnes, visited Aguilar to see if he needed any medical attention after the altercation. [Id., Ex. 11]. In the force report Barnes drafted, he documented that Aguilar responded, "[y]ou can suck a dick too mother fucker," which the officer interpreted as a refusal of medical care. [Id.]. Later that evening, though, a nurse was called to look at Aguilar's inner left foot, which Aguilar reported he had hurt earlier that day. [Id., Ex. 12, p. 2]. The nurse observed bruising to the left foot but no swelling. [Id.]

After the search Aguilar was placed in Cell N-165, where he remained until he was released into the custody of federal authorities on October 15, 2018. [Id., Taylor Aff. ¶ 6 & Hull Aff. ¶¶ 4, 12]. Superintendent Hull avers that, while Aguilar was housed there, he was provided a jumper, mattress, bedding, three meals a day with liquids, occasional showers, laundry, and phone calls. [Id., Hull Aff. ¶ 12]. Sergeant English, who was NNRJ's Standards Compliance Officer at the time, concedes that the water had been turned off in Cell N-165 while Aguilar was housed there, but only because on the day Aguilar was placed there, he had broken the sprinkler head, causing water to flood the cell [Id., English Aff. ¶ 11 & Ex. 18]. English asserts that the

water in Aguilar's cell was turned on daily during every meal as well as every two hours to allow him to flush the toilet. [Id., English Aff. ¶ 11].

NNRJ's Deputy Superintendent, Major Phyllis Back, declares via affidavit that she authorized random strip searches of Aguilar while he was in segregation "to deter and prevent plaintiff's possession of contraband and for the safety and security of NNRJ, staff, inmates, and the public." [Id., Back Aff. ¶ 8]. Contrary to Aguilar's assertion, Sergeant English attests that Aguilar was not under constant supervision; rather, other inmates could walk by his cell and make contact with him, and he could use materials in his cell (e.g., the light and sprinkler) to make a shank. [Id., English Aff. ¶ 12]. Sergeant Taylor and Lieutenant Newsome do not contest that they performed some of the authorized strip searches, nor do they directly contest the manner in which Aguilar describes them. [Id., Taylor Aff. ¶ 7 & Newsome Aff. ¶ 4]. Instead, they contend only that they conducted the searches "in accordance with NNRJ policy and at the direction of Major Back." [Id.].

## II. Judgment on the Pleadings

A motion under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings may be granted on the ground that the complaint fails to state a claim for relief. See Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999). In assessing Aguilar's claim alleging failure to protect, the Court has not considered evidence outside of the complaint. Therefore, the Court need not convert the portion of defendants' motion addressing this claim into a motion for summary judgment. See Fed. R. Civ. P. 12(d).

### A) Failure to Protect Claim

In the complaint Aguilar claims that Lieutenant Luna violated his Fourteenth Amendment rights "[b]y witnessing defendant Taylor's illegal actions, failing to correct that misconduct, and

6

allowing the continuation of such misconduct." [Pl. Compl. ¶ 42]. But the complaint does not explain what actions, taken by Taylor, Luna failed to protect him from. Was it the alleged excessive force? The manner in which Taylor searched him? Both? Thus, even liberally construing Aguilar's claim, as the Court must, it cannot conclude that Aguilar has "fairly put [the] defendant on notice of the claim[] being asserted and the essential bases therefor." See Engle v. United States, 736 F. Supp. 670, 671–72 (D. Md. 1989); see also Erickson v. Pardus, 551 U.S. 89, 93–94 (2007). For that reason Luna is entitled to judgment on the pleadings for Aguilar's failure-to-protect claim.

### III. Summary Judgment

For the remaining three claims, which allege excessive force, unlawful searches, and unconstitutional conditions of confinement, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." Hupp v. Cook, 931 F.3d 307, 317 (4th Cir. 2019) (internal quotation marks and citations omitted). In evaluating a summary judgment motion, the Court views the evidence, and draws all inferences, in the light most favorable to the nonmoving party. See E.W. by T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018).

**A) Strip Search Claim**

Aguilar and defendants Sergeant Taylor and Lieutenant Newsome have cross-moved for summary judgment on Aguilar's claim that the officers conducted unreasonable strip searches. For his part, Aguilar argues that the searches were conducted not to guarantee the safety of the prison but, instead, to harass, intimidate, and punish him. He urges that the officers' nefarious

7

motive can be inferred from the fact that searches were unnecessary, given that he was under constant supervision and therefore could not obtain contraband like a shank, and because the officers forced him to squat and cough in front of numerous other officers. Aguilar further avers that Newsome, in conducting his search, inappropriately "grabbed plaintiff's buttocks and spread them while saying 'I gotta make sure you don't have a shank up your ass.'" [Compl. ¶ 41].

Jails may conduct visual strip and body-cavity searches of pretrial detainees, but those searches must be conducted reasonably. See Bell v. Wolfish, 441 U.S. 520, 558, 560 (1979). Determining whether a particular search is reasonable "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails," by considering "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which is it conducted." Id. at 559.

Oddly, in opposing Aguilar's motion for summary judgment, defendants argue that summary judgment on this claim would be "inappropriate" because there are "facts material to this determination in dispute." [Dkt. No. 50, Def. Opp. Br., at p. 9]. Yet in their motion for summary judgment on that claim, they ignore those disputed facts and argue that summary judgment—based on their version of events—is warranted in their favor. That is not how summary judgment works. The Court may accept one party's factual account only if the other party's version of events "is blatantly contradicted by the record," for example, through videotaped evidence, "so that no reasonable just could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007). Otherwise, without evidence "of undisputed authenticity that shows some material elements of plaintiff's account to be 'blatantly and demonstrably false,'" summary judgment cannot be granted when material facts are disputed. Harris v. Pittman, 927 F.3d 266, 276 (4th

Cir. 2019) (noting limits of Scott) (quoting Blaylock v. City of Philadelphia, 504 F.3d 405, 414 (3d Cir. 2007)).

Defendants have not presented any undisputedly authentic evidence countering Aguilar's verified allegations. Indeed, many facts material to whether the searches were reasonably conducted are disputed, including whether the searches were necessary because Aguilar could obtain a shank or other contraband; whether Aguilar presented a security risk because he had previously damaged his cell in an escape attempt; whether Lieutenant Newsome and Sergeant Taylor gathered other officers to witness the search solely to humiliate Aguilar; and whether Lieutenant Newsome assaulted Aguilar during his search. Thus, the Court is not persuaded by the defendants' flip-flop in position, and will deny both parties' motions for summary judgment on the strip-search claims.

### B) Conditions of Confinement Claim

Aguilar claims that conditions he endured for eleven days in Cell N-165 were unlawful under the Fourteenth Amendment. In particular, he contends that he was left without clothing (besides an undergarment), drinking water, and a mattress. [Id. ¶ 28]. He further asserts that he was provided smaller-than-normal amounts of food during that period. [Id.].

In evaluating a challenged condition under the Fourteenth Amendment, the Court asks whether it amounts to "punishment." Williamson v. Stirling, 912 F.3d 154, 174 (4th Cir. 2018). In making that assessment, the Court may look to Eighth Amendment jurisprudence because "[t]he constitutional protections guaranteed to a pretrial detainee under the Fourteenth Amendment are co-extensive with those provided to convicted prisoners by the Eighth Amendment." Kovari v. Brevard Extraditions, LLC, 461 F. Supp. 3d 353, 381 (W.D. Va. 2020) (internal quotation marks and citations omitted). Thus, the Court makes two inquiries, one

9

objective and one subjective: (1) whether Aguilar suffered an objectively serious deprivation of "the minimal civilized measure of life's necessities" (the objective component); and (2) whether the defendants acted with deliberate indifference to Aguilar's health and safety (the subjective component). See Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks and citation omitted).

The Court cannot conclude that Aguilar was subjected to an objectively serious deprivation while confined in Cell N-165. Indeed, similar conditions to those described by Aguilar have been upheld as lawful. For instance, the Fourth Circuit has found that no constitutional violation occurred when an inmate was confined to a cell for ten days without personal hygiene items, a mattress, bedding, towels, and clothing. See Lowery v. Bennett, 492 F. App'x 405, 407 (4th Cir. 2012). And though "inmates must be provided nutritionally adequate food," Shrader v. White, 761 F.2d 975, 986 (4th Cir. 1985), Aguilar contends only that the portions of food he received were smaller than normal, not that it was an insufficient amount of food. As for drinking water, Superintendent Hull avers that Aguilar received three meals a day with liquids. [Def. Mot. for Summ. J., Hull Aff. ¶ 12]. That assertion is supported by the segregation chart submitted as evidence. [Id., Ex. 16]. Moreover, Aguilar does not contest that water was served with meals, only that the water in the cell was shut off and therefore unavailable on demand. Material facts therefore do not demonstrate that Aguilar was deprived of adequate sustenance or humane conditions in the segregation cell. Judgment thus will enter in defendants' favor on this claim.

### C) Excessive Force Claim

Aguilar bring claims for excessive force against Lieutenant Luna and Sergeant Taylor based on the alleged attack on September 24, 2018. In the verified complaint, Aguilar describes

an unprovoked attack, while restrained, at the hands of the two officers, in which Luna repeatedly punched him in the back of the head and forcefully applied his knee on one side of Aguilar's face; in which Taylor pulled his shackles in a manner that caused him to faceplant onto the concrete floor, bent and twisted his left foot, big toe, hands, and wrists, and forcefully applied his knee to Aguilar's back; and in which the two, along with backup officers, dragged him and smashed him against the cell door. Aguilar avers that the beating caused swelling to the left side of his face, a bloody, split lip, and contusions to his face and body. He has also submitted an affidavit from another inmate, George Fleming, who avers that he saw the officers "beat up Oscar while his hands were cuffed behind his back and with leg irons on," and "drag Oscar out of his cell with shackles, [and] slam him against the wall." [Dkt. No. 48, Fleming Aff. ¶ 11].

The officers counter Aguilar's claim by presenting evidence showing a differing account of the altercation. Lieutenant Luna avers that he ordered Aguilar numerous times to get on his knees so that restraints could be removed and he could be searched, but, instead, Aguilar "refused repeatedly, and became combative, actively resisting our attempts to remove his restraints, and kicking the officers." [Def. Mot. for Summ. J., Luna Aff. ¶ 7]. Luna and Taylor memorialized Aguilar's behavior in a force report, which Aguilar does not contest. [Id. Ex. 8 & Ex. 10]. For that reason, the Court shall accept as fact that Aguilar refused Luna's orders, actively resisted, and kicked the officers trying to restrain him. Further, the officers contend that the injuries Aguilar describes are contradicted by his medical records, which show that a nurse observed only bruising to one foot.

For a pretrial detainee to demonstrate excessive force, the inmate "must show only that the force purposely or knowingly used against him was objectively unreasonable." Kingsley v.

Hendrickson, 576 U.S. 389, 396–97 (2015). This showing "turns on the 'facts and circumstances of each particular case,'" including, but not limited to, the following:

> [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

Id. at 397 (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)). "To properly consider the reasonableness of the force employed [the Court] must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." Smith v. Ray, 781 F.3d 95, 101 (4th Cir. 2015) (internal quotation marks and citation omitted). Therefore, the amount and type of force used is key to the inquiry.

At bottom, there are disputes of material fact about the manner in which force was applied, even if some force was undeniably justified when Aguilar was combative, thus precluding summary judgment on the excessive force claim. While it is undisputed that Aguilar became combative during the search, Lieutenant Luna and Sergeant Taylor make the conclusory assertion that they "only employed the force necessary to gain plaintiff's compliance." [Dkt. No. 60, Def. Mot. for Summ. J., Luna Aff. ¶ 9 & Taylor Aff. ¶ 5]. These statements can be interpreted in two ways: (1) Defendants are asserting that the force described by Aguilar was "the force necessary to gain plaintiff's compliance"; or (2) defendants are asserting that they used some other, undescribed force, that was necessary to gain plaintiff's compliance. Either way, the Court "consider[s] self-serving opinions without objective corroboration," such as the officers' conclusory assessments of the amount and type of force used, "not significantly probative" to determine whether the officers applied excessive force. See Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996); see also Nnadozie v. Genesis HealthCare Corp., 730 F. App'x 151, 160 (4th Cir. 2018) (distinguishing "unadorned opinion"

12

from "testimony replete with alleged facts" in affidavits submitted in support of summary judgment). Without any evidence from the defendants *describing* the type and amount of force used, or whether any effort was made to temper to use of force, the Court cannot conclude that undisputed facts demonstrate that the force applied was proportional to Aguilar's conduct and the need to quell his resistance. Indeed, the six factors "bearing on the reasonableness of a particular application of force, are not to be considered in a vacuum but only in relation to the amount of force used," thus rendering this missing information critical to the Court's analysis. See Chew v. Gates, 27 F.3d 1432, 1441 (9th Cir. 1994). The Court therefore must deny summary judgment on Aguilar's claim that Lieutenant Luna and Sergeant Taylor applied excessive force.[1]

### D) Exhaustion

Defendants briefly argue that summary judgment in their favor is warranted on the ground that Aguilar failed to exhaust administrative remedies on each claim. They assert that no record exists establishing that Aguilar requested or filed an informal complaint or grievance form related to the September 24, 2018 event and subsequent searches and cell conditions. Conversely, Aguilar attests that his requests for grievance forms were ignored.

Disputed material facts preclude summary judgment on exhaustion grounds. Although Sergeant Taylor declares that he, indeed, provided Aguilar with an informal request form, [Def. Mot. for Summ. J., Taylor Aff. ¶ 8], Aguilar avers his requests went unanswered, [Compl., p. 3]. This kind of he said/she said evidence is a factual dispute that only a jury may resolve.

---

[1] Although the Court could deny summary judgment based on the above analysis alone, it is worth noting that the parties additionally dispute the extent of Aguilar's injuries. While defendants point to a medical record in which a nurse observed only that Aguilar had bruising on his left foot, Aguilar declares that the injury to his foot was severe enough that eventually a nurse ordered an X-ray. [Dkt. No. 65, Pl. Aff.].

13

See Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 726 (2d Cir. 2010) (concluding that court could not decide fact dispute over remarks made in private conversation).

## IV. Conclusion

For the reasons outlined above, and through an Order that will issue alongside this Memorandum Opinion, defendants' motion for judgment on the pleadings as to plaintiff's claim for failure to protect shall be GRANTED. Defendants' motion for summary judgment will be GRANTED as to the claim for unconstitutional conditions of confinement and DENIED as to the claims for unreasonable searches and excessive force.[2] Finally, plaintiff's second motion for summary judgment will be DENIED.

Entered this 25th day of February 2021.

Alexandria, Virginia

/s/
Anthony J. Trenga
United States District Judge

---

[2] To the extent Aguilar seeks declaratory relief on any of his claims, his release from NNRJ renders those claims moot. [Def. Mot. for Summ. J., Ex. 1]. See Rendelman v. Rouse, 569 F.3d 182, 186 (4th Cir. 2009).